[Cite as *Juhas v. Juhas*, 2014-Ohio-5364.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| LANCE JUHAS | : | |
| | : | Appellate Case No. 26186 |
| Plaintiff-Appellant | : | |
| | : | Trial Court Case No. 10-DR-1257 |
| v. | : | |
| | : | |
| KATHLEEN JUHAS | : | (Civil Appeal from Common Pleas |
| | : | Court, Domestic Relations) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of December, 2014.

. . . . . . . . . . .

JEFFREY D. SLYMAN, Atty. Reg. #0010098, 211 Kenbrook Drive, Suite 5, Vandalia, Ohio
45377
    Attorney for Plaintiff-Appellant

PATRICIA N. CAMPBELL, Atty. Reg. #0068662, 90 East Franklin Street, Bellbrook, Ohio
45305
    Atorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, J.

**{¶ 1}**    Lance Juhas appeals from the trial court's judgment finding him in civil contempt for violating the final judgment and decree of divorce that ended his marriage to Kathleen Juhas. The court found that he failed to comply with the provision in the parties' divorce agreement, incorporated into the final judgment, concerning the division of stock options. Specifically, the court found that Lance exercised Kathleen's share of the options and sold her stock without her authorization and then improperly deducted from her net proceeds her share of the tax liability incurred on the sale. Lance challenges the trial court's findings. We conclude that the court did not err, so we affirm.

## I. FACTS

**{¶ 2}**    The judgment decree of divorce that ended the parties' marriage was entered in September 2011. The decree incorporates the parties' agreement on certain matters, including the division of stock options held in Lance's name.[1] Article VII of their agreement gives Kathleen half of the options, describes how she exercises them, and assigns all tax liability to Lance:

> There exist 52,711 shares of stock with Bravo Development, Inc.,[2] of which all but 16,673 stock options have been previously and mutually divided.

---

[1] These are options to buy stock in Bravo Brio Restaurant Group, Inc., the public company, trading on the NASDAQ, at which Lance is a district partner and which granted him the options. "Options are contracts through which a seller gives a buyer the right * * * to buy or sell a specified number of shares at a predetermined price within a set time period." NASDAQ, *Options Defined*, http://www.nasdaq.com/investing/options- guide/definition-of-options.aspx (accessed Nov. 13, 2014). "Employees who are granted stock options hope to profit by exercising their options to buy shares at the exercise price when the shares are trading at a price that is higher than the exercise price." U.S. Securities and Exchange Commission, *Employee Stock Option Plans*, http://www.sec.gov/answers/empopt.htm (accessed Nov. 13, 2014).

[2] The company changed its name to Bravo Brio Restaurant Group, Inc. in June 2010.

The remaining 16,673 stock options are held solely in Husband's name.

Within a two week window subsequent to Bravo Development, Inc.'s report of earnings, the stock options can be exercised. Wife shall be entitled to one-half (1/2) of the 16,673 stock options exercisable in the following manner: Husband shall inform Wife of the appropriate window for exercising any of her portion of the stock options. Wife shall inform Husband of her desire to sell any of the shares of stock represented by the option within twenty-four (24) hours of being notified by Husband of appropriate window. Sales of stock pursuant to this section are deemed ordinary income to Husband. In addition, Husband assumes any and all tax liability generated by the exercise of the stock options.

{¶ 3}　The company releases its earnings quarterly, with the first quarter ending on the last day of April. At the end of the first quarter of 2012, the stock price was at a high of $21.50. On May 1, Kathleen emailed Lance and told him that she wanted to exercise half of her options and sell the stock at this price. The order was placed, but it was too late to be exercised that day. The order was renewed the next day, but by then the price had fallen. The target price was never reached, so the options were never exercised. The next opportunity to exercise the options, at the end of the second quarter, opened in August. In July, Kathleen sent Lance an email saying in part, "i will be selling some/or all of the stock next window, so i'll need to know when that is * * *."[3] On August 1, Lance emailed Kathleen to say that the window would be open for 30 days and that the stock's price was down 15%, to a low of $15.51. Kathleen replied the same day saying, "i'll keep my eye on it, thanks for the info, have you discussed this w/jeff yet? or do I just go ahead

---

[3]Kathleen rarely used capital letters in her emails to Lance.

and sell and then take you to court?"[4] The next day, August 2, Lance sent her an email that says, "Not exactly sure what you want me to say. I would suggest we watch what the stock does, if it gets to $18 - $20 I will probably sell." Kathleen responded soon after saying, "that's fine, if you haven't talked to jeff about coming up with a compromise, when the stock is sold and, assuming the taxes are withheld, you will be held in contempt of court and we will be going to court, sounds like fun, i guess!"

{¶ 4} Lance exercised all of the options on August 16 and sold the stock for $16.28. Kathleen's net proceeds were $123,119.03.[5] But the check that Lance gave her was for only $86,211.42 because he deducted her share of the tax liability which was automatically withheld at the time of sale.

{¶ 5} On October 2, Kathleen filed a motion to find Lance in contempt for failing to comply with Article VII. At a hearing before a magistrate, she argued that she had not authorized Lance to exercise her options and that he should not have deducted the tax liability. She asked for reimbursement of the tax liability and additional damages of $31,011.78 as her lost income (the difference between the price that the shares sold for and her desired price of $20). The magistrate agreed that Lance did not have Kathleen's authorization and found him in contempt. The magistrate awarded Kathleen attorney's fees, court costs, and the amount deducted for the tax liability but denied Kathleen's damage request. Lance filed objections with the trial court.

{¶ 6} The trial court found that the parties had protracted discussions over the exercise

---

[4] She is talking about the tax liability on the sale of the stock. In their May email exchange, Lance indicated that he would be deducting her share of the tax liability withheld on the sale. Kathleen strenuously objected, saying that would violate Article VII. Jeff is Lance's attorney.

[5] The cost of her options and her share of the exercise fees were deducted.

of the stock options and had expressed concern to each other about the stock's declining value. As the value continued to fall, they discussed the options but did not reach an agreement about how to proceed. After the August email exchange, Lance believed that he had authorization to exercise the options to minimize further loss. But, while there is "little doubt" that Lance believed that he was acting in Kathleen's best interest, concluded the court, the evidence shows that she never authorized him to exercise her options when he did. (*Decision and Judgment*, 5).

{¶ 7}   The court found Lance in civil contempt for failing to comply with Article VII of the divorce decree and awarded Kathleen $350 in attorney's fees, $125 in court costs, and $36,907.61 as reimbursement for the withheld tax liability. It denied Kathleen's damage request. The court imposed a three-day suspended jail sentence on Lance on the condition that he pay the reimbursement and allowed Lance to purge the contempt by paying the attorney's fees and court costs.

{¶ 8}   Lance appealed.

## II. ANALYSIS

{¶ 9}   The sole assignment of error alleges that the court erred by finding Lance in contempt because the finding is against the manifest weight of the evidence.

{¶ 10}   "The standard of review for manifest weight is the same in a civil case as in a criminal case." *Smith v. Smith*, 11th Dist. Geauga No. 2013-G-3126, 2013-Ohio-4101, ¶ 42, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17; *see also Erwin v. Erwin*, 9th Dist. Wayne No. 13CA0009, 2014-Ohio-874, ¶ 17 (applying the manifest-weight standard from *Eastley*). Presented with a weight-of-the-evidence challenge, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences,

considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Jenkins v. Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, ¶ 10 (2d Dist.), citing *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 71; *see also State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley* at ¶ 20. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Jenkins* at ¶ 18; *Thompkins* at 387 (saying the same).

{¶ 11} "Civil contempt is the failure to do something the court has ordered in a civil action for the benefit of the opposing party therein." (Citation omitted.) *Boston Hts. v. Cerny*, 9th Dist. Summit No. 23331, 2007-Ohio-2886, ¶ 20. Contempt may be punished. R.C. 2705.02(A) (saying that one who disobeys a court's order or judgment "may be punished as for a contempt"). "To support a finding of contempt, the moving party must establish by clear and convincing evidence that a valid court order exists, that the offending party had knowledge of the order, and that the offending party violated such order." (Citations omitted.) *Polk v. Polk*, 2d Dist. Montgomery No. 24882, 2012-Ohio-2968, ¶ 10. Civil contempt can be found even when the offending party claims his actions were unintentional. *Jenkins* at ¶ 14, 20. " 'Clear and convincing evidence' is 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " (Citations omitted.) *Polk* at ¶ 10, quoting *Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d 327, 331, 708 N.E.2d 193 (1999).

**{¶ 12}** Lance does not challenge the divorce decree's validity, but he does challenge the other two elements-violation and knowledge. Lance contends that the evidence shows that he did have Kathleen's authorization to exercise the options and sell the stock. Additionally he contends that he did not have sufficient knowledge of the meaning of Article VII's "any and all tax liability" language to find him in contempt.

### A. Was Lance authorized to exercise Kathleen's options?

**{¶ 13}** "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, at ¶ 21. "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). 'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *Jenkins*, 2012-Ohio-4182, 975 N.E.2d 1060, at ¶ 19, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). For this reason, " '[w]hen there exist two fairly reasonable views of the evidence, we may not choose which view we prefer. Instead we must accede to the jury * * *.' " *State v. Kelly*, 2d Dist. Champaign No. 2001-CA-14, 2002 WL 1000433, *3 (May 17, 2002), quoting *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999), citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *Serdy v. Serdy*, 7th Dist. Noble No. 13

NO 400, 2013-Ohio-5532, ¶ 31 (quoting the same).

{¶ 14} The parties agree that they had been watching the stock's price before the close of 2012's first quarter. And they agree that when the price hit a high of $21.50 on May 1, Kathleen authorized Lance to exercise half of her options and sell the stock. Lance believed that he continued to have her authorization, and he argues that she never revoked it. Kathleen argues that her authorization ended and that she never renewed it.

{¶ 15} There is no evidence that after the May 2 email exchange the parties continued to discuss the exercise of the options again during that selling window. Kathleen's July 24 email says only that she wants to exercise options during the August window, and her August 1 email says only that she will "keep [her] eye on" the price. Lance's August 2 email tells Kathleen that if the price climbs to $18 he "will probably sell." Kathleen's response: "that's fine, if you haven't talked to jeff about coming up with a compromise, when the stock is sold and, assuming the taxes are withheld, you will be held in contempt of court and we will be going to court."

{¶ 16} We conclude that the trial court's finding that Lance did not have Kathleen's authorization is not against the manifest weight of the evidence. It is true that Kathleen's August 2 response could be interpreted as giving Lance authorization to exercise her options and sell the stock. But it is also true that she is responding to Lance's statement that he will sell if the price gets to at least $18. When Lance did sell, the price was well under this amount. Given that both are reasonable views of the evidence, we must defer to the trial court's finding that Lance did not have Kathleen's authorization to exercise her options and sell the stock.

## B. Did Lance properly deduct the tax liability?

{¶ 17} Lance also contends that he did not have sufficient knowledge of the decree,

specifically, the meaning of "any and all tax liability" in Article VII. A contempt finding also requires "that the offending party had knowledge of the order" alleged to have been violated. *Polk*, 2012-Ohio-2968, at ¶ 10. But this knowledge concerns notice that the allegedly violated order was entered, which is usually established by showing service. *See Ullmer v. Ullmer*, 2d Dist. Montgomery No. 8715, 1984 WL 5377, *4 (July 13, 1984) ("[I]t is essential to the punishment of a person for contempt for the violation of a court order that he have notice of the order, either actual or by service of the same upon him."); *Sancho v. Sancho*, 114 Ohio App.3d 636, 642-643, 683 N.E.2d 849 (3d Dist.1996) (" 'It is essential to the punishment of a person for contempt for the violation of a court order, that he have notice of the order, either actual or by service of the same upon him.' "), quoting *McWhorter v. Curran*, 57 Ohio App. 233, 245, 13 N.E.2d 362 (7th Dist.1935). Lance does not claim a lack of notice but that the trial court's interpretation of Article VII is "erroneous." (*Brief of Plaintiff-Appellant, Lance Juhas*, 11). "There is clearly [a] major dispute between the parties," he says, "as to the interpretation of 'any and all tax liability' and, accordingly, as to how either party might violate that provision of the decree." (*Id*. at 9-10). Given Lance's argument, we consider the interpretation of Article VII as to the tax liability incurred by the exercise of the options and sale of the stock.

{¶ 18} "Agreements incorporated into divorce decrees are contracts and are subject to the rules of construction governing other contracts." *Majeski v. Majeski*, 2d Dist. Montgomery No. 24668, 2012-Ohio-731, ¶ 13. Contractual questions are reviewed de novo, unless the contract is ambiguous, in which case the trial court's clarification is reviewed for abuse of discretion. *Id*. Whether a contract is ambiguous, however, is a question of law. *Id*. "A contract is ambiguous if, after applying established rules of interpretation, the written instrument, 'remains reasonably

susceptible to at least two reasonable but conflicting meanings, when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.' " *Try Hours, Inc. v. Douville*, 2013-Ohio-53, 985 N.E.2d 955, ¶ 13 (6th Dist.), quoting 11 Lord, *Williston on Contracts*, Section 30.4, at 39-41 (4th Ed.1999).

{¶ 19} Regarding tax liability, Article VII provides: "Sales of stock pursuant to this section are deemed ordinary income to Husband. In addition, Husband assumes any and all tax liability generated by the exercise of the stock options." The preliminary question is whether this language may reasonably mean what Lance believed it meant.

{¶ 20} Lance explained at the hearing that Kathleen could not exercise the options herself because they were not and could not be in her name.[6] So when the options were exercised and the stock sold, she would not have to claim the proceeds as income. The benefit to her is that she would not ascend into a higher income-tax bracket. Instead, the net proceeds are "deemed ordinary income" to Lance, and because of this, he assumes "any and all tax liability," which he understands to mean the possibility that the proceeds could cause him to ascend into a higher bracket or decrease the tax refund to which he might otherwise be entitled. Tax liability and reimbursement, Lance argues, are two completely different concepts. The decree, he notes, does not mention reimbursement or say that he must reimburse Kathleen for the tax liability deducted at the time of the sale. Rather, says Lance, Article VII simply states that he is responsible for the tax liability. By ordering him to reimburse Kathleen, Lance asserts, the trial court in effect added a reimbursement provision that has the consequence of requiring him to pay the tax liability on Kathleen's options twice-once to the IRS and once to Kathleen.

---

[6] Lance testified that the company's bylaws forbid her from holding options in her name.

**{¶ 21}** The problem with Lance's argument is that it concerns not the tax liability itself but the withholding of a portion of the gross sale proceeds for a potential tax liability which is allocated exclusively to him by the decree. The plain language of Article VII is that Lance is responsible for "any" tax owed and "all" taxes owed. The article does not address tax withholding; it is concerned only with the liability itself, that is, who is responsible for the tax that will eventually be paid. Deducting any tax owed from Kathleen's net proceeds effectively makes her responsible for some of the tax liability. This is contrary to the article's plain language. Article VII is not susceptible to Lance's interpretation. We conclude, therefore, that it is not ambiguous. If the parties intended for Kathleen's share to be reduced by the tax liability incurred by Lance that was attributable to her share of the proceeds, then the decree could have said so. It does not.

**{¶ 22}** "If an ambiguity does not exist, the trial court 'may not construe, clarify or interpret the parties' agreement to mean anything outside of that which it specifically states.' " (Citations omitted.) *Majeski*, 2012-Ohio-731, at ¶ 13, quoting *Pavlich v. Pavlich*, 9th Dist. Summit No. 22357, 2005-Ohio-3305, ¶ 7. Article VII requires Lance to pay the entire tax liability, consequently Kathleen is entitled to the full net proceeds from the sale of her share of the stock without regard to potential tax liability withheld at the time of the transaction. Therefore the trial court properly ordered Lance to reimburse her.

**{¶ 23}** The sole assignment of error is overruled.

**{¶ 24}** The trial court's judgment is affirmed.

. . . . . . . . . . . .

FROELICH, P.J., and FAIN, J., concur.


Copies mailed to:

Jeffrey D. Slyman
Patricia N. Campbell
Hon. Denise L. Cross